UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| ROBERT D. BOWEN, )  ) | |
| Plaintiff, ) ) | |
| v. ) ) | Cause No. 4:06cv0115-AS |
| MICHAEL J. ASTRUE, ) COMMISSIONER OF ) SOCIAL SECURITY, ) ) | |
| Defendant. ) | |

## MEMORANDUM, ORDER, & OPINION

Plaintiff, Robert D. Bowen, seeks judicial review of the denial of his claim for benefits and a period of disability under Title II of the Social Security Act. The Commissioner of Social Security found Mr. Bowen was not entitled to a period of disability nor Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416 (I), 423. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Mr. Bowen applied for DIB on July 2, 2002. (R. 19). His application was denied initially and upon reconsideration, so he requested and was granted a hearing before Administrative Law Judge ("ALJ") Robert E. Hanson on June 30, 2004. (R. 19, 34). Attorney Timothy P. Broden represented Mr. Bowen and vocational expert Gail Ditmore provided testimony. *Id*. Mr. Bowen's wife Diane was present, but she did not testify. *Id*. The ALJ denied benefits on August 27, 2005. (R. 28). Mr. Bowen obtained

representation by attorney Charles D. Hankey and requested for the Appeals Council to review the decision, but his appeal was denied on May 31, 2006.  (R. 5, 10).

## I.  Background

<u>Statement of Facts</u>

Mr. Bowen was forty-six at the time of the hearing.  (R. 38).  He was six feet and three-fourths inches tall and weighed 340 pounds.  (R .38-39).  He had been married about seventeen or eighteen years and had four children of ages five, six, seven, and eighteen.  (R. 39).  He graduated from high school and had vocational training to repair heating and cooling appliances.  (R. 40).  He worked in the past as an appliance repairman, a fork lift operator, and a baserail installer.  (R. 40-43).

<u>Medical Evidence</u>

In October 2000, Mr. Bowen suffered a probable lumbopelvic sprain with right sacroiliitis and lumbar radiculitis while shifting a five-hundred pound crate at his material handler job.  (R. 188).

In April 2001, Mr. Bowen saw Dr. Sliwkowski for ongoing lower back pain.  (R. 144).  He was restricted to carrying, lifting, pushing, or pulling not greater than ten pounds.  *Id*.

On May 8, 2001, Dr. Sliwkowski ordered an MRI which showed an acute disk herniation at L4-5 with lumbar stenosis and compression of the L4 nerve root.  (R. 142).  Moderate to severe central stenosis with circumferential bulging presented at L3-4, L2-3,

and L1-2. (R. 139). Orthopedic specialist Dr. Gorup examined Mr. Bowen and determined he had an absent right patellar reflex with a positive straight right leg raise and no significant sensory or motor deficits. (R. 145). His impression was that Mr. Bowen had a right L4 radiculopathy due to a foraminal L4-5 disc herniation. (R. 146). He referred Mr. Bowen to Dr. Sapir for a transforaminal steroid injection. (R. 146-47).

On May 22, 2001, Dr. McLimore evaluated Mr. Bowen. (R. 181-83). His recommendation was to have a right intra-articular sacroiliac injection with physical therapy. (R. 183).

On June 22, 2001, Mr. Bowen told Dr. McLimore that the intraarticular right sacroiliac injection he received in May had alleviated seventy-five percent of the pain in his back and right hip. (R. 178). The doctor decided to proceed with a transforaminal right L4-5 block with an epidural steroid injection followed by physical therapy. *Id*. He restricted Bowen's work activities to occasional lifting, pushing, and pulling with no repetitive movements, as well as no standing or sitting longer than thirty minutes. *Id*.

On July 12, 2001, Dr. McLimore reported Mr. Bowen's pain relief from the corticosteroid injection did not last. (R. 176). He placed him at sedentary work status and withheld physical therapy. *Id*.

On July 25, 2001, Mr. Bowen saw Dr. Dietz for back and right leg pain. (R. 158). He observed Mr. Bowen had a markedly antalgic gait favoring his right side and significant pain in his right buttock at the lumbosacral junction. (R. 159). Dr. Dietz

agreed with the diagnoses of spinal stenosis at L2-3 and L3-4 and multiple level degenerative changes in the lumbar spine. (R. 160). Dr. Dietz opined that the L4-5 disc herniation was contributing to Bowen's current condition and he ordered a CT myelogram.

In September 2001, Dr Watanabe interpreted the lumbar spine CT and the lumbar myelography scans. (R. 148-51). The lumbar spine CT showed multi-level disc degenerative disease and endplate marginal osteophytosis. (R. 148). At L4-5, there was a broad-based right foraminal disc herniation with compression of the right L4 nerve root ganglion. (R. 148-49). At L2-3 there was degeneration and bulging with moderate to severe central canal stenosis and hypertrophic changes. *Id*. At L1-2 there was degeneration and bulging without stenosis. *Id*. The lumbar myelography showed lumbar spondylosis deformans with multi-level disc degenerative disease and anterior extradural defects. (R. 151). Dr. Dietz suggested surgery to relieve the leg pain. (R. 157).

In November 2001, Dr. Dietz decided against surgery due to Bowen's uncontrolled blood pressure and weight issues. (R. 155).

On January 4, 2002, Dr. Dietz noted Mr. Bowen had debilitating severe back pain and right leg pain. (R. 153). The doctor mentioned Bowen had an L4 nerve cutoff on the myelogram and he felt the best option was nonsurgical treatment. *Id*. He put him on Naprosyn and referred him to Dr. McLimore. *Id*.

On January 24, 2002, Dr. McLimore noted Mr. Bowen was not getting benefit

4

from physical therapy, ordered a Functional Capacity Evaluation (FCE), and put Bowen on the pain medication Ultram.  (R. 174).

On January 30, 2002, physical therapist Simone Buhler at Advanced Physical Therapy completed an FCE on Mr. Bowen.  (R. 162-68, 173).  Strong tendencies toward inappropriate illness behaviors were indicated on the pain questionnaires.  (R. 167). Buhler placed Bowen in the light physical demand level from floor to waist; the medium category for twelve inches to waist, forty to seventy-four inches, and carry; and the medium heavy level for thirty inches to shoulder.  *Id*.

In February 2002, Dr. McLimore cited to the FCE and placed the following restrictions on Mr. Bowen: "no lifting floor to waist greater than 15 pounds (occasionally); no lifting waist to shoulder greater than 65 pounds (occasionally) or greater than 32 pounds (frequently); no lifting 12" to waist height or carrying greater than 35 pounds (occasionally); no lifting overhead greater than 45 pounds (occasionally); no carrying greater than 35 pounds (occasionally); no push/pull activities greater than 145 pounds (occasionally)." (R. 170-71).  Climbing, use of ladders, kneeling, or crawling was limited to occasional occurrences and Bowen was not allowed to stand or sit for more than thirty minutes, walk over seven-hundred feet at a time, or do any repetitive lifting, twisting, or bending.  (R. 171).

On April 19, 2002, Dr. Carl Griffin evaluated Mr. Bowen for a Permanent Partial Impairment Rating.  (R. 188-89).  He determined Mr. Bowen's impairment was 11% for

5

his whole person. (R. 189). He found signs of radiculopathy and no loss of muscle strength. *Id*.

In October 2002, Mr. Bowen had a checkup and reported he was taking Ultram for his back pain. (R. 403). The heel and toe walk gave him difficulty with his right leg and he had decreased sensation to light touch in his right foot. *Id*. He was given hydrocodone for the pain to replace Ultram. *Id*. Mr. Bowen held off physical therapy for his back due to scheduling conflicts and was given a booklet with back exercises. (R. 402).

Mr. Bowen's Residual Functional Capacity Assessment set exertional limitations to occasional lifting of twenty pounds and frequent lifting and carrying of ten pounds and standing and sitting for a duration of six hours. (R. 225). He had unlimited push and pull abilities. *Id*. He was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R. 226). Mr. Bowen's symptoms were noted as credible per the file. (R. 229). These findings were based on Mr. Bowen's MRIs, motor deficits, and absent patellar reflex. (R. 225).

On February 13, 2003, Mr. Bowen received TENS and gait training with a cane. (R. 423).

In March 2003, Mr. Bowen mentioned that the hydrocodone he was taking for his back did help. (R. 428).

In July 2003, Mr. Bowen reported that the hydrocodone was no longer controlling the pain. (R. 438).

6

On August 18, 2003, Dr. Satyanarayana Raju assessed Mr. Bowen's chronic back pain and noted that the pain was subjectively rated at four out of ten and that Mr. Bowen used a cane on his right side to ambulate. (R. 287). Both of his lower extremities had good active range of motion and motor strength of five out of five. *Id*. He was scheduled for an MRI of his lumbrosacral spine. *Id*.

On August 25, 2003, the results from the MRI showed severe degenerative disc disease at L2-3 with severe central stenosis, a right lateral L4-5 disc herniation compressing the right L4 ganglion, and several bulging discs. (R. 305).

In January 2004, psychologist David Jarmon filled out a medical source statement of mental ability to do work-related activities. (R. 237-38). He determined Mr. Bowen's abilities to remember, understand, and carry out instructions and his ability to respond to his co-workers were not affected by his impairments. *Id*. The psychologist noted that Bowen would have a reduced efficiency for complex tasks. (R. 238). Mr. Bowen saw Dr. Choi and was given Darvocet for his back pain. (R. 250).

In February 2004, Dr. Choi noted that Mr. Bowen was taking Darvocet, hydrocodone, and oxycodone for his back pain and felt this was unwise because of his hepatitis. (R. 253). The oxycodone was stopped because Mr. Bowen found it ineffective and he was started on Percocet which he continued refilling monthly. (R. 510).

On July 20, August 17, and September 17, 2004, Dr. Raju issued Percocet for Mr.

7

Bowen after receiving a reported pain level of eight to ten without medication. (R. 494, 497).

On October 18, 2004, Mr. Bowen contacted Dr. Raju for an oxycodone refill and reported a pain level of seven out of ten. (R. 489). He stated his pain was so great he had to sit up to sleep and that his right leg and foot had lost feeling. (R. 490). The neurosurgery clinic would not perform surgery due to his Interferon treatments for hepatitis C. *Id*. He was given a prescription for Percocet. *Id*.

On October 29, 2004, at one of his follow-up appointments concerning hepatitis C, Mr. Bowen reported having headaches about 4 days a week. (R. 485).

On November 8, 2004, Mr. Bowen saw Dr. Raju for a followup appointment. (R. 483). Neurosurgeons at the Indianapolis Veterans Association Medical Center had recommended weight loss with the potential for future back surgery if the pain worsened. (R. 484). All his extremities had good range of motion, but he did have tenderness to palpation in his lower lumbar paraspinal muscles. *Id*. Dr. Raju discontinued Mr. Bowen's Percocet due to his liver problems and put him on plain oxycodone instead. *Id*.

Plaintiff's Testimony

Mr. Bowen testified that from June 1989 to May 1993, he repaired Sears appliances. (R. 43). From June 1993 to June 1999, he bought appliances at auctions and sold them from his garage in addition to performing some freelance appliance servicing. (R. 44). From July 1999 to May 2000, he had an assembly job as a baserail installer

8

putting together tractor trailers for semis. (R. 42). Finally, from May 2000 to March 2001, he operated a forklift until he was injured when a box of motor parts fell on him. (R. 41-42, 58). He stopped working on March 29, 2001. (R. 59).

Mr. Bowen stated he has pain in his lower back that shoots down his right leg and knee. (R. 47). His hip aches and he can't feel his right foot. (R. 46-47). He cannot walk for long distances, pick up his children, or bend over to pick things up. (R. 47). He has a problem with falling caused by his severe back pain which makes his legs buckle and he rides a cart to get around stores. (R. 48). Both the pain and his weight have increased since the initial injury. *Id*. He had taken Lortab and Vicodin for his back pain, but does not any longer. (R. 54).

He has hepatitis C that he contracted twenty-seven years ago while in the Army. (R. 49). There was a note that said Mr. Bowen had tried to contract it to get out of the Army, but Bowen stated he "didn't really try to get it" and he had received it while fighting. *Id*. Complications due to the hepatitis include an enlarged stomach and pain upon palpation of the liver. *Id*. His liver function tests continue to rise and he is scheduled for interferon treatments. (R. 50).

Mr. Bowen had a twenty-five year history of drug and alcohol use, until he stopped drinking and smoking marijuana in 2002. (R. 51). He had high blood pressure that gave him migraines, but it is controlled with medication. (R. 52). He had depression, nightmares, and irritability which were effectively treated with Paxil. (R. 52-53).

9

Mr. Bowen testified that he could not pick up anything other than his cane. (R. 54). He could walk up to seven hundred feet, stand for about a half-hour, and sit for forty-five minutes. (R. 55). He cannot play the guitar anymore or do household chores, but he is able to feed and dress himself. (R. 55, 56). A typical day for him from March to December 2001 consisted of getting his older kids ready for school and babysitting his four-year-old son. (R. 57). He would walk out to the mailbox sometimes and watch cartoons while sitting in the recliner. *Id*. He has difficulty sleeping at night due to difficulty finding a comfortable position. (R. 57, 58).

Vocational Expert's Testimony

Vocational expert ("VE") Gail Ditmore testified that Mr. Bowen could be a light or sedentary level inspector or assembler if he had unlimited standing or sitting; no repetitive stooping, bending, or twisting; and lifting, pushing or pulling of ten pounds or less. (R. 66). If he had to change positions every half hour, then he would be limited to sedentary assembler and inspector jobs. (R. 68). If he had additional lifting, pushing, and pulling restrictions, he could perform a limited number of the assembler and inspector jobs. (R. 69). She stated that a person with the limitations Mr. Bowen testified to in the hearing would be unable to perform any job in the economy. (R. 65).

The ALJ's Findings

The findings of the ALJ are as follows:

1. The claimant met the disability insured status requirements of the Act only through December 31, 2001 and not after that date.

10

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

3. The medical evidence establishes that the claimant has "severe" impairments consisting of degenerative disc disease, obesity, hepatitis C, and substance abuse.

4. The claimant does not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Regulations No. 4.

5. The claimant retains the functional capacity to perform simple and repetitive sedentary exertional work with the following additional restrictions: no lifting floor to waist greater than 15 pounds (occasionally); no lifting waist to shoulder greater than 65 pounds (occasionally); or greater than 32 pounds (frequently); no lifting 12 inches to waist height or carrying greater than 35 pounds (occasionally); no lifting overhead greater than 45 pounds (occasionally); no carrying greater than 35 pounds (occasionally); no push/pull activities greater than 145 pounds (occasionally); only occasional climbing, use of ladders, kneeling, or crawling; sitting for six hours in a work day with no prolonged sitting or standing greater than 30 minutes; no walking over 700 feet at one time; and no repetitive lifting, twisting or bending.

6. The claimant's allegations of pain, other symptoms, and functional limitations are not entirely credible.

7. The claimant is unable to perform his past relevant work as a fork lift operator, semi trailer assembler, and an appliance repairman.

8. The claimant is a younger individual.

9. The claimant has a high school education.

10. The claimant has no transferrable skills.

11. Based on exertional capacity for sedentary work, and the claimant's age, education, and work experience, Medical-Vocational Rules 201.21 and 201.28 would direct a conclusion of not disabled.

12. Although the claimant's limitations do not allow him to perform the full range of sedentary work, using Rules 201.21 and 201.28 as a framework for decision-making, there are a significant number of jobs in the State of Indiana which he could perform. Examples of such jobs are: assembler (1,800 jobs) and inspector (900 jobs).

13. The claimant has not been disabled, within the meaning of the Social Security Act, at any time relevant to this decision.

The ALJ's Decision

Based on the application filed on July 2, 2002, the ALJ found that "the claimant is not entitled to a period of disability or Disability Insurance Benefits under Sections 216(I) and 223, respectively, of the Social Security Act." (R. 28).

## II. Standard of Review

This court's review of the Commissioner's decision is a limited one. Unless there is an error of law, the court will uphold the Commissioner's findings of fact if they are supported by substantial evidence. *Schoenfeld v. Apfel,* 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971). In making a substantial evidence determination, the court will review the record as a whole, but will not reevaluate the facts, re-weigh the evidence or substitute its own judgment for that of the Commissioner. *Williams v. Apfel,* 179 F.3d 1066, 1071-72 (7th Cir. 1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.

2000).  *See also, Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995).

With respect to credibility determinations, the ALJ is in the best position to observe the demeanor and veracity of the testifying witnesses.  *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).  The court will not disturb the ALJ's weighing of credibility so long as those determinations are based on some support in the record and are not "patently wrong."  *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).  However, the district court is required to critically review the evidence and not simply rubber-stamp the Commissioner's decision.  *Clifford*, 227 F.3d at 869

### III. Discussion

"Benefits are available only to those individuals who can establish disability under the terms of the Social Security Act." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).  Under section 423(c)(1)(B)(1), it is well established that to receive benefits, a disability must have begun or had its inception during the period of insured status.  *Bolinger v. Barnhart,* 446 F. Supp. 2d 950, 954 (N.D. Ind. 2006) (citing *Bastian v. Schweiker*, 712 F.2d 1278, 1280 (8th Cir. 1983).  A claimant has the burden of establishing that he is disabled within the meaning of the Social Security Act on or before the date his insured status expired.  *Estok*, 152 F.3d at 640; *Meredith v. Bowen*, 833 F.2d 650 (7th Cir. 1987); *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985); *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1984); *Jeralds v. Richardson*, 445 F.2d 36, 39 (7th Cir. 1971).  "The law

requires that a claimant demonstrate [his] disability within the proscribed period of eligibility not prior to or subsequent to the dates in question." *Jeralds,* 445 F.2d at 39. Therefore, "any condition that had its onset or became disabling after plaintiff's insured status expired may not be used as a basis for entitlement to disability benefits." *Couch v. Schweiker*, 555 F. Supp. 651, 654 (N.D. Ind. 1982). Plaintiff bears the burden of showing through testimony and medical evidence supported by clinical data and laboratory diagnosis that he was disabled during the period in which he was insured. *Reading v. Matthews*, 542 F.2d 993, 997 (7th Cir. 1976) *(citing, Jeralds,* 445 F.2d at 38-39).

The claimant must show that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations to the Act create a five-step inquiry in determining whether a claimant is disabled. As previously discussed, the ALJ must consider the applicant's claim in the following sequence:

> (1) whether the claimant is currently employed; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one listed by the Secretary; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing any work in the national economy.

*Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520*)*. The initial burden in steps one through four is on the plaintiff; only at step five does the burden shift to the Commissioner. *Bolinger*, 446 F. Supp. 2d at 955.

Mr. Bowen claims the decisions of the Commissioner of Social Security and the ALJ were not supported by substantial evidence and should be reversed. However, the ALJ's decision that Mr. Bowen could perform work despite his limitations was reasonable based on the evidence in the record and accordingly will not be reversed.

The ALJ performed a detailed and careful analysis of Mr. Bowen's claim, performing an evaluation for each of the required five sequential steps. (R. 20-26).

The ALJ thoroughly examined the objective medical evidence for Mr. Bowen's degenerative disc disease, obesity, substance abuse, and hepatitis C conditions that significantly interfered with his working abilities and concluded the severity did not meet the listing criteria. (R. 26). While the ALJ does not have to assess every piece of evidence in making a decision, he is required to "build an accurate and logical bridge between the evidence and the result." *Shramek*, 226 F.3d at 811. The ALJ accomplished this result for this case and made significant efforts to include a complete listing of Mr. Bowen's major impairments in his investigation. He included an analysis on the obesity impairment, though it no longer had a listing in Appendix 1, Subpart P, Regulations No.4. (R. 21). Additionally, Mr. Bowen's combined mental impairments and their effect on his daily activities, social functioning, concentration, and memory were assessed to determine if there was significant impairment that would prevent his participation in simple work activities. (R. 21-22). He supported his findings with numerous references to physician opinions and relevant examination results, showing he gave substantial consideration to

15

the opinions of the plaintiff's treating physicians when making his decision. ALJ's cannot play doctor and make their own medical decisions when deciding a case; the decision must be based on testimony and medical evidence according to the record. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). For Mr. Bowen's case, the ALJ adhered to procedure and his finding concerning the severity of the impairments was supported by substantial objective evidence from the record.

The ALJ's determination that Mr. Bowen's subjective statements of his pain were not credible as to prevent his performance of a range of sedentary work was also supported by substantial evidence. An ALJ must provide specific reasons for a credibility finding and may not merely issue a simple statement that the plaintiff's allegations have been considered. *Zurawski. v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). "Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other objective medical evidence in the record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007). The ALJ provided specific reasoning for his decision by referencing several situations where Mr. Bowen gave inconsistent testimony concerning his injuries and symptoms. (R. 23-24). He cited to evaluating physicians notations of maladaptive and inappropriate testing behaviors. (R. 23). The ALJ also gave sufficient, specific reasoning supported by substantial evidence concerning the effects of factors other than just the objective medical evidence on Mr. Bowen's subjective pain allegations including precipitating and

16

aggravating factors, medication, other treatment measures, functional limitations, and activities of daily living.  (R. 24-25).

Finally, when considering whether Mr. Bowen could perform his past relevant work, the ALJ relied on the VE's testimony to reach his decision.  A VE's testimony constitutes substantial evidence if it reflects the plaintiff's impairments as supported by evidence in the record.  *Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002).  During testimony, the ALJ and the VE discussed detailed hypotheticals listing Mr. Bowen's limitations, most directly quoted with references to their location in the record.  (R. 63-71).  Since the VE's testimony reflected Mr. Bowen's impairments taken directly from the record, the ALJ did not err to rely on the testimony as substantial evidence.

## IV.  Conclusion

This court's review is restricted, meaning the court will not independently re-weigh evidence or re-decide credibility issues.  The purpose of this court's review is to ensure that the ALJ's decision is supported by and comports with substantial evidence.  Since the ALJ's decision is supported by substantial evidence, the decision of the Commissioner is **AFFIRMED**.

**SO ORDERED.**

**Dated: August 17, 2007**

                                              **S/ ALLEN SHARP**
                                              **ALLEN SHARP, JUDGE**
                                              **UNITED STATES DISTRICT COURT**